# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### BOSTON DIVISION

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY<br><br>            Plaintiff,<br><br>   vs.<br><br>VIZIO, INC.<br><br>              Defendant. | Civil Action No. 1:12-cv-10900-DJC |

## VIZIO, INC.'S FIRST AMENDED ANSWER TO MIT'S COMPLAINT AND COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff VIZIO, Inc. ("VIZIO"), by and through its counsel, hereby submits its First Amended Answer and Counterclaims to MIT's Complaint for patent infringement of U.S. Patent Nos. 5,187,575 ("the '575 patent"); 5,218,435 ("the '435 patent"); 5,444,491 ("the '491 patent"); 5,485,210 ("the '210 patent"); (collectively, the "Patents-in-Suit") as follows:

### THE PARTIES

1.     VIZIO admits Plaintiff Massachusetts Institute of Technology is located at 77 Massachusetts Avenue, Cambridge, Massachusetts 02319.  VIZIO lacks knowledge sufficient to admit or deny the remaining allegations and therefore denies the same.

2.     VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 2 and therefore denies the same.

3.      VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 3 and therefore denies the same.

4.      VIZIO admits MIT was a member of the "Grand Alliance."  For the remaining allegations, VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 4 and therefore denies the same.

5.      VIZIO admits the FCC established the Advisory Committee on Advanced Television Service.  For the remaining allegations, VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 5 and therefore denies the same.

6.      VIZIO admits the "Grand Alliance" provided a proposal to the ATSC, and the ATSC adopted the proposal.  VIZIO denies that the Grand Alliance's proposal combined the best features of the digital approaches to high definition television.  For the remaining allegations, VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 6 and therefore denies the same.

7.      VIZIO admits the ATSC's standards for digital television were recommended in 1995, and that the FCC adopted portions of the ATSC's standards in 1996.  For the remaining allegations, VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 7 and therefore denies the same.

8.      VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 8 and therefore denies the same.

9.      VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 9 and therefore denies the same.

10.     VIZIO denies the allegations in Paragraph 10.

11.     VIZIO admits it is a corporation organized under the laws of the State of California and has a principal place of business at 39 Tesla, Irvine, CA 92618.  VIZIO admits that it sells audiovisual products, such as digital televisions, Blu-ray disc players, and home theater and audio systems.  VIZIO admits it sells products at Walmart, Target, and Sears, and through the online websites www.amazon.com, www.walmart.com, www.target.com, and www.vizio.com.  VIZIO denies that any of its Accused Products infringe any valid claim of any of the patents-in-suit.  VIZIO denies the remaining allegations in Paragraph 11.

### JURISDICTION AND VENUE

12.     VIZIO admits this action purports to arise under the Patent Laws of the United States, Title 35, United States Code, and that this Court has jurisdiction over the subject matter of this action.  VIZIO denies the legal sufficiency of Plaintiff's claims and allegations and denies that Plaintiff has any viable claim against VIZIO.

13.     VIZIO does not contest that this Court has personal jurisdiction over it, but VIZIO denies it has committed any act of infringement.  VIZIO denies the remaining allegations in Paragraph 13.

14.     Denied.

### COUNT I
**(Infringement of U.S. Patent No. 5, 187,575)**

15.     VIZIO re-alleges and incorporates by reference the preceding Paragraphs.

16.     VIZIO admits that U.S. Patent No. 5,187,575 states as its title "Source Adaptive Television System."   VIZIO admits that on its face, the '575 patent lists an issuance date of February 16, 1993.  VIZIO admits a copy of the '575 patent was attached to the Complaint as Exhibit A.  VIZIO denies the remaining allegations in Paragraph 16.

17.     VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 17 and therefore denies the same.

18.     VIZIO denies Paragraph 18.

19.     VIZIO denies Paragraph 19.

20.     VIZIO denies Paragraph 20.

21.     VIZIO denies Paragraph 21.

22.     VIZIO denies Paragraph 22.

23.     VIZIO denies Paragraph 23.

24.     VIZIO denies Paragraph 24.

**COUNT II**
**(Infringement of U.S. Patent No. 5, 218,435)**

25.     VIZIO re-alleges and incorporates by reference the preceding Paragraphs.

26.     VIZIO admits that U.S. Patent No. 5,218,435 states as its title "Digital Advanced Television Systems."   VIZIO admits that on its face, the '435 patent lists an issuance date of June 8, 1993.  VIZIO admits a copy of the '435 patent was attached to the Complaint as Exhibit A.  VIZIO denies the remaining allegations in Paragraph 26.

27.     VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 27 and therefore denies the same.

28.     VIZIO denies Paragraph 28.

29.     VIZIO denies Paragraph 29.

30.     VIZIO denies Paragraph 30.

31.     VIZIO denies Paragraph 31.

32.     VIZIO denies Paragraph 32.

33.     VIZIO denies Paragraph 33.

34.     VIZIO denies Paragraph 34.

## COUNT III
### (Infringement of U.S. Patent No. 5, 444,491)

35.     VIZIO re-alleges and incorporates by reference the preceding Paragraphs.

36.     VIZIO admits that U.S. Patent No. 5,444,491 states as its title "Television System with Multiple Transmission Formats."  VIZIO admits that on its face, the '491 patent lists an issuance date of August 22, 1995.  VIZIO denies the remaining allegations in Paragraph 36.

37.     VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 37 and therefore denies the same.

38.     VIZIO denies Paragraph 38.

39.     VIZIO denies Paragraph 39.

40.     VIZIO denies Paragraph 40.

41.     VIZIO denies Paragraph 41.

42.     VIZIO denies Paragraph 42.

43.     VIZIO denies Paragraph 43.

## COUNT IV
### (Infringement of U.S. Patent No. 5, 485,210)

44.     VIZIO re-alleges and incorporates by reference the preceding Paragraphs.

45.     VIZIO admits that U.S. Patent No. 5,485,210 states as its title "Digital Advanced Television Systems."  VIZIO admits that on its face, the '210 patent lists an issuance date of January 16, 1996.  VIZIO denies the remaining allegations in Paragraph 45.

46.     VIZIO lacks knowledge sufficient to admit or deny the allegations in Paragraph 46 and therefore denies the same.

47.     VIZIO denies Paragraph 47.

48.     VIZIO denies Paragraph 48.

49.     VIZIO denies Paragraph 49.

50.     VIZIO denies Paragraph 50.

51.     VIZIO denies Paragraph 51.

52.     VIZIO denies Paragraph 52.

## AFFIRMATIVE DEFENSES

53.     Without admitting or acknowledging that it bears the burden of proof, and reserving its right to amend its Answer to add additional Affirmative Defenses, VIZIO pleads the following Affirmative Defenses.

## FIRST AFFIRMATIVE DEFENSE
### (Noninfringement)

54.     VIZIO has not infringed, induced the infringement of, contributed to the infringement of, or otherwise directly or indirectly infringed any valid, enforceable claim of the Patents-in-Suit asserted by Plaintiff.

## SECOND AFFIRMATIVE DEFENSE
### (Invalidity)

55.     The asserted claims of the Patents-in-Suit are invalid for failure to comply with the requirements for patentability specified in, but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

## THIRD AFFIRMATIVE DEFENSE
### (Laches)

56.     Plaintiff's attempted enforcement of the Patents-in-Suit against VIZIO and any claim for damages is barred in whole or in part under the doctrine of laches.

## FOURTH AFFIRMATIVE DEFENSE
### (Estoppel)

57.     Plaintiff's attempted enforcement of the Patents-in-Suit against VIZIO is barred in whole or in part under the doctrine of equitable estoppel.

## FIFTH AFFIRMATIVE DEFENSE
### (Failure to Mark)

58.     On information and belief, Plaintiff and/or its licensees have failed to mark or cause to be marked patented articles with the numbers of the Patents-in-Suit, or otherwise provide notice of the patents-in-suit to VIZIO under 35 U.S.C. § 287, prior to filing its Complaint.

59.     35 U.S.C. § 287 precludes Plaintiff from recovering any damages for alleged infringement, if any, that occurred prior to the time it provided the required notice to VIZIO.

## SIXTH AFFIRMATIVE DEFENSE
### (License and/or Exhaustion)

60.     To the extent that Plaintiff has licensed or otherwise exhausted its rights and remedies as to products or services that are accused by way of Plaintiff's Complaint, VIZIO is not liable to Plaintiff for any alleged acts of infringement related to such products or services.

## SEVENTH AFFIRMATIVE DEFENSE
### (FRAND)

61.     To the extent the Patents-in-Suit are essential to practice the ATSC or MPEG-2 standards, or that VIZIO's Accused Products allegedly infringe the Patents-in-Suit because the Accused Products comply with the ATSC or MPEG-2 standards, Plaintiff is required to license the Patents-in-Suit on fair, reasonable, and nondiscriminatory terms.  Plaintiff is prohibited from recovering any alleged damages in excess of an amount based on the proper fair, reasonable, and nondiscriminatory royalty rate for the Patents-in-Suit.

## EIGHTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

62.     Plaintiff fails to state a claim against VIZIO upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

## NINTH AFFIRMATIVE DEFENSE
### (No Injunctive Relief)

63.     Plaintiff is not entitled to injunctive relief as, at a minimum, it has no irreparable injury and it has an adequate remedy at law for VIZIO's alleged infringement.

## TENTH AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel)

64.     Under the doctrine of prosecution history estoppel, Plaintiff is estopped from asserting the doctrine of equivalents as to arguments and amendments made to obtain allowance of the patent applications that issued as the Patents-in-Suit.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Time Limitation on Damages)

65.     35 U.S.C. § 286 precludes Plaintiff from recovering any damages for alleged infringement of the Patents-in-Suit, if any, that occurred more than six years prior to the filing of the Complaint.

## PRAYER FOR RELIEF

WHEREFORE, VIZIO requests entry of judgment in its favor and against Plaintiff as follows:

A.  Dismissal of the Complaint with prejudice;

B.  That Plaintiff take nothing by reason of this lawsuit;

C.  That this Court adjudge that VIZIO has not infringed any of the Patents-in-Suit;

D.  That this Court adjudge that the Patents-in-Suit are invalid and/or unenforceable;

E.  That this Court award costs and attorneys' fees in favor of VIZIO to the extent appropriate and permitted by law; and

F.  Such other and additional relief as the Court may deem proper.

## DEFENDANT'S COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff VIZIO, Inc. ("VIZIO") hereby counterclaims against Massachusetts Institute of Technology ("MIT") as follows:

## THE PARTIES

66.     Counterclaim-Plaintiff VIZIO is a corporation organized and existing under the laws of the State of California with its principal place of business at 39 Tesla, Irvine, California 92618.  VIZIO is a leading seller of LCD display televisions in the United States.

67.     VIZIO was founded in 2002 and first launched its brand in 2003.  VIZIO has been headquartered in Irvine, California since 2002.  VIZIO started as a small company with only three employees—now it employs over a 160 individuals.   Since its inception, VIZIO has become a leader in consumer electronics, and in particular, a leading seller of digital televisions.

68.     VIZIO is an innovator in the digital television market, and its digital televisions have won numerous awards and received recognition over the years for their high quality and reasonable prices.

69.     VIZIO relies on third party suppliers and manufacturers for its televisions, including any components for ATSC and MPEG-2 standards capabilities.

70.     Counterclaim-Defendant MIT is a university located at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139.

71.     MIT claims to be the owner of the Patents-in-Suit.  MIT has charged VIZIO with infringement of the Patents-in-Suit.  VIZIO has denied the charge of infringement and has alleged the Patents-in-Suit are invalid and unenforceable.

## JURISDICTION AND VENUE

72.     This Court also has jurisdiction over these counterclaims based upon the Patent Laws of the United States, 35 U.S.C. § 1, *et. seq.*  This is also an action for declaratory judgment arising under 28 U.S.C. § 2201 based on an actual controversy between MIT and VIZIO due to MIT's allegations of infringement of the Patents-in-Suit.

73.     Personal jurisdiction is proper in this judicial district at least because MIT is a resident of this judicial district, and MIT has consented to jurisdiction in this judicial district by filing its Complaint against VIZIO in this Court.

74.     Venue for these counterclaims is proper in this district.

## NATURE OF THIS ACTION

75.     VIZIO brings this counterclaim for MIT's breach of its contractual commitments to standards development organizations to license its patents "essential" to practicing certain technology standards under reasonable and nondiscriminatory terms and conditions ("RAND"). These standards development organizations include, but are not limited to, the Advanced Television Systems Committee ("ATSC"), International Telecommunications Unions ("ITU"), and International Organization of Standardization ("ISO").

76.     Patents that are necessary to perform, use, or implement a technology standard are deemed "essential" to practicing the standard.  In this case, MIT has taken the position that the Patents-in-Suit are essential to practicing certain digital television standards, including but not limited to (1) the ATSC's digital television technology standards (known as "DTV"), and (2) the video coding technologies generally standardized as "MPEG-2" (ISO/IEC 13818 and ITU H.262 standards).

77.     Participants in these organizations' standard-setting efforts are subject to strict patent licensing policies.  These patent licensing policies require a participating patent holder to

submit a patent statement or declaration that it will license its "essential" patents either without compensation or under RAND terms.  MIT submitted patent statements and/or declarations to the ATSC, ITU, and ISO agreeing to license its "essential" patents on RAND terms.

78.     On information and belief, MIT has made similar commitments to other standard development organizations to license its essential patents related to digital television standards on RAND terms.

79.     MIT broke its promises to the ATSC, ITU, ISO, and its members and implementers, by refusing to license to VIZIO its standard essential patents under terms consistent with its RAND obligations.   Instead, MIT demanded and continues to demand royalties that are excessive, unreasonable, and discriminatory.

## BACKGROUND ON DIGITAL TELEVISION STANDARDS

80.     Technology standards played and continue to play a critical role in the development of digital television technology.  Standards facilitate the adoption and advancement of technology as well as the development of products that can interoperate with one another, even devices made by other manufacturers.  Companies that produce products compatible with a standard can design products by referencing only the standard documentation, without the need to communicate separately with every other company with which their products may need to interoperate.  Companies producing products that implement a standard facilitate interoperability among different products, and consumers of those products can be confident that products from multiple vendors will work together as intended under the standard.

81.     In order to reduce the likelihood that implementers of the standards will be subject to abusive practices by patent holders, standard development organizations ("SDOs") have adopted rules, policies, and procedures that address the disclosure and licensing of patents

related to technology included in the standards.  These rules, policies, and/or procedures are set out in the intellectual property rights policies ("IPR policies") of the SDOs.

82.     Many IPR policies encourage or require participants to disclose on a timely basis the patents, or patent pending technologies, that they believe are relevant to the developing standard.  The policy in question may permit the patent holder to disclose that it likely holds such patent rights instead of identifying specific patents.  These disclosures permit the SDOs and their members to evaluate technologies that may affect the costs of implementing the standard.

83.     IPR policies usually require owners of essential patents to commit to license their patents to any implementer of the standard on RAND terms before the SDO incorporates such patented technology into the standard.  As their inclusion in the IPR policies of various SDOs suggests, such patent commitments are crucial to the standards development process.  They enable participants in standards development to craft technology standards with the expectation that an owner of any patented technology will be prevented from demanding unfair, unreasonable, or discriminatory licensing terms and thereby be prevented from imposing undue costs or burdens on parties seeking to implement the standard.

## MIT'S COMMITMENTS TO THE ATSC

84.     The ATSC is an SDO formed to develop, implement, and promote voluntary national technical standards for advanced television systems.  The ATSC developed standards for digital television that specify technologies for the transporting, formatting, compressing, and transmitting of DTV in the U.S.

85.     Beginning in the early 1990s, the ATSC began developing a series of standards relating to digital television.  Three main groups promoted competing systems for digital television: 1) AT&T and Zenith Electronics Corp.; 2) General Instrument Corp. and the Massachusetts Institute of Technology; and 3) Philips Consumer Electronics, Thomson

Consumer Electronics, and the David Sarnoff Research Center.  In 1993, these three groups—including MIT—decided to form a "Grand Alliance" to collude on developing a single proposed standard in an attempt to corner the technology in the digital television market.

86.     Based upon the work of the Grand Alliance and the development of the "Grand Alliance HDTV System," the ATSC adopted the initial standard for digital terrestrial television, known as the A/53 Digital Television Standard.  The A/53 Digital Television Standard includes elements of the MPEG-2 standard, which is directed to the coding of moving pictures and associated audio information.  The ATSC followed this with a series of additional standards directed to various aspects of digital television broadcasting.

87.     Beginning in 1996, the FCC adopted major elements of the ATSC standards, including the ATSC standards based on MPEG-2 and A/53, which are the main digital television standards for the U.S.

88.     Pursuant to the FCC's mandate, digital terrestrial broadcast transmissions in the U.S. must be compatible with ATSC standards.  Based on the mandate, television sets sold in the U.S. must be capable of receiving such digital terrestrial broadcast transmissions.

89.     The FCC's adoption of the ATSC's standards was conditioned upon all ATSC participants agreeing to license, on RAND terms, technology that the participants deemed relevant to the standard.  The FCC made this condition explicit in its document adopting the standard:

> In earlier phases of this proceeding we indicated that*, in order for [digital television ("DTV")] to be successfully implemented, the patents on the technology would have to be licensed to other manufacturing companies on reasonable and nondiscriminatory terms.*  We noted that the system proponents that participated in the Advisory Committee's competitive testing process were required to submit a statement that they would comply with the [American National Standards Institute] patent policies.  The proponents agreed to make any relevant patents that they owned available either free of charge or on a reasonable,

nondiscriminatory basis and we stated that we intended to condition selection of a DTV system on such commitments. . . . *We reiterate that adoption of this standard is premised on reasonable and nondiscriminatory licensing of relevant patents*…

90.     To prevent any one company from being able to monopolize or otherwise control a standard that was intended to be open and available to all, the ATSC required at that time, and continues to require today, that owners of patents covering technologies that are included in ATSC standards license all "essential patent claims" to implementers of the standards on RAND terms.  This mandate is found in the ATSC Patent Policy, which provides that "[i]t shall be the policy of the [ATSC] that Essential Claims included in the ATSC Specification Documents be available to implementers on reasonable and nondiscriminatory terms."  Specifically, the ATSC Patent Policy requires that all ATSC participants provide a written agreement that they will license, either without compensation or on RAND terms, any invention whose use would be required for compliance with the proposed ATSC standard.  VIZIO, an implementer of these standards, is a third party beneficiary of those contractual commitments.

91.     MIT has represented that it owns rights in a number of patents that may be essential to practicing the ATSC's DTV technologies.

92.     The ATSC's required written agreements are contractual commitments on the part of the patent holders.  MIT signed a written agreement with the ATSC stating that it owns issued and pending patents that cover the Grand Alliance HDTV System and that "MIT will offer licenses under those patents with reasonable terms that are demonstrably free from unfair discrimination to any qualified applicant."  The written agreement was signed by Professor Jae S. Lim, who is the named inventor for each of the Patents-in-Suit.  On information and belief, MIT openly and publicly submitted the agreement on or about February 22, 1995.

93.     In submitting its Patent Statement pursuant to the applicable ATSC policy, MIT entered into a contract with the ATSC for the benefit of ATSC members and implementers of the DTV technologies, such as VIZIO.  MIT is bound by its agreements to offer licenses consistent with its RAND obligations to third party implementers of the standards.

94.     The ATSC, and its participants relied on MIT's promises in developing, adopting, and implementing the DTV technical standards.  These standards are now implemented and required in all digital televisions in the United States.

## MIT'S COMMITMENTS TO SDOS DEVELOPING MPEG-2 STANDARDS

95.     The ITU is the leading United Nations agency for information and communication technology issues, and the global focal point for governments and the private sector in developing networks and telecommunication services. The ITU historically has coordinated the shared global use of the radio spectrum, promoted international cooperation in assigning satellite orbits, worked to improve telecommunication infrastructure in the developing world, established the worldwide standards that foster seamless interconnection of a vast range of communications systems, and addressed the recent global challenges of our times, such as strengthening cyber security.

96.     On information and belief, MIT is also a member of the ITU.  The ITU has standardized MPEG-2 technology under the ITU-T H.262 standard.

97.     The ITU's patent policies similarly require members to license their patents on RAND terms.  Similar to the ATSC, the ITU requires its members and participants to disclose their patents essential to practicing any submitted standard and to submit a Patent Statement and Licensing Declaration.  The ITU's Common Patent Policy generally provides, in pertinent part, that a patent holder's Patent Statement and Licensing Declaration must declare either:

(2.1) The patent holder is willing to negotiate licenses free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions.

(2.2) The patent holder is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions.

98.     According to the ITU's IPR policy, a Patent Statement and Licensing Declaration is irrevocable after submission and shall be in force at least until the standard's withdrawal.

99.     If the Patent Statement and Licensing Declaration was not provided for relevant patents from participants, the ITU would either (1) revise the standard so that compliance could be achieved without facing any potential issues related to such patent(s), (2) discontinue work on the standard altogether, or (3) otherwise proceed in a manner consistent with the nondisclosure and lack of Patent Statement and Licensing Declarations so that participating and relying entities would not be exposed to discriminatory patent assertions and/or unreasonable licensing terms.

100.    MIT has represented that it owns rights in a number of patents that may be essential to practicing the H.262 (MPEG-2) technologies.

101.    On information and belief, on or about April 27, 1994, MIT declared to the ITU that it will license its patents that are essential to the H.262 (MPEG-2) standard on RAND terms.

102.    In submitting its Patent Statement and Licensing Declarations pursuant to the applicable ITU policy, MIT entered into a contract with the ITU for the benefit of ITU members and implementers of H.262 (MPEG-2) technologies, such as VIZIO.  MIT is bound by its agreements to offer licenses consistent with its RAND obligations to third party implementers of the standards.

103.    The ISO is an international standard-setting body composed of representatives from various national standards organization.  On information and belief, MIT is also a member of the ISO.  The ISO has standardized MPEG-2 technology under the ISO/IEC 13818 standard.

104.    Similar to the ATSC, the ISO requires its members and participants to disclose their patents essential to practicing any submitted standard and to submit a Patent Statement and Licensing Declaration.   The ISO's patent policies require members to license their standard essential patents on RAND terms or free of charge.

105.    MIT has represented that it owns rights in a number of patents that may be essential to practicing the ISO/IEC 13818 (MPEG-2) technologies.

106.    On information and belief, MIT signed multiple patent declarations with ISO that it will license its patents that are essential to the ISO/IEC 13818 (MPEG-2) standard on RAND terms.   On information and belief, MIT openly and publicly submitted these patent declarations on or about October 14, 1993.

107.    In submitting its Patent Statement and Licensing Declarations pursuant to the applicable ISO policy, MIT entered into a contract with the ISO for the benefit of ISO members and implementers of ISO/IEC 13818 (MPEG-2) technologies, such as VIZIO.   MIT is bound by its agreements to offer licenses consistent with its RAND obligations to third party implementers of the standards.

108.    The ITU, ISO, and its participants relied on MIT's promises in developing, adopting, and implementing the MPEG-2 technical standards.

### MIT'S RAND OBLIGATIONS

109.    SDOs have implemented numerous policies requiring patent holders to promise to license their standard essential patents to implementers on RAND terms.   The primary purpose of the RAND obligation is to prevent holders of standard essential patents from abusing the standards setting process by extracting unwarranted value from implementers and harming the adoption of the standards.   RAND principles are intended to prevent two primary issues with licensing standard essential patents: "patent hold-up" and "royalty stacking."

17

110.    "Patent hold-up" is an attempt by a patent holder to seek a royalty that captures the value of the standard itself as opposed to the value of the individual patent.   The patent holder seeks to leverage the value of the patent being adopted as part of the standard instead of the incremental value (if any) that the essential patent may contribute to the standard and the related products.   There is substantial value in the standard itself apart from any contribution of the patented technology to the standard, and the RAND commitment exists so that holders of standard essential patents cannot demand more than they contribute.

111.    "Royalty stacking" involves the implementer making cumulative royalty payments to other standard essential patent holders on the same technology and standard.   These cumulative royalty payments add up to reduce any potential profits.   A patent holder must consider the overall licensing landscape in the RAND negotiations and must ensure that the aggregate royalties associated with a given standard are reasonable.

## MIT BREACHED ITS RAND OBLIGATIONS

112.    In this case, it is MIT's position that the Patents-in-Suit are essential to practicing the ATSC and/or MPEG-2 standards.   In its Complaint, MIT asserts that it developed its technology claimed in the Patents-in-Suit as part of the "Grand Alliance HDTV System," which MIT alleges was adopted as the ATSC standards.   MIT also accuses VIZIO's products of infringing the Patents-in-Suit because they "comply with the ATSC, MPEG-2 and/or MPEG-4" standards.   Further, MIT relied on the ATSC and/or MPEG-2 standards as its basis for VIZIO's accused products infringing the Patents-in-Suit in its Preliminary Infringement Contentions.

113.    Because MIT asserts the Patents-in-Suit are essential to practicing the ATSC and/or MPEG-2 standards, MIT is bound by its patent statements and obligations to SDOs to license the Patents-in-Suit on RAND terms.   MIT, however, refuses to offer a RAND royalty

rate, and instead demands a rate disproportionate to the value of the Patents-in-Suit in violation of its licensing obligations.

114.    In particular, MIT demands more than the value of its patented technology in an improper attempt to capture the value of the standards itself (patent hold-up).  MIT refuses to offer a license based on the incremental value (if any) that its allegedly essential patents contribute to the standards and the accused products, and instead continues to attempt to improperly leverage the value of the standards as a whole in violation of its RAND obligations.

115.    MIT failed to account and mitigate for cumulative royalty payments by VIZIO to other standard-essential patent holders on the same technology and standards (royalty stacking).  MIT refuses to offer a royalty rate consistent with other standard-essential patent licensors, such as patent pools, and their respective patent portfolios.

116.    MIT has thereby refused to offer VIZIO a license at a reasonable rate, with reasonable terms, under conditions that are demonstrably free of any unfair discrimination.  By failing to offer a license on RAND terms, and by filing a lawsuit before offering a license on RAND terms, MIT has breached its contracts with the ATSC, ISO, and ITU, to which VIZIO is a third party beneficiary.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment of Invalidity)

117.    VIZIO re-alleges and incorporates by reference the allegations set forth in Paragraphs 66-116.

118.    VIZIO seeks a declaratory judgment that the Patents-in-Suit, including each of the claims thereof, are invalid for failure to comply with the requirements of the patent statutes, including but not limited to the failure to comply with the conditions and requirements of patentability set forth in 35 U.S.C. §§ 101, 102, 103, and 112.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment of Noninfringement)

119.    VIZIO re-alleges and incorporates by reference the allegations set forth in Paragraphs 66-118.

120.    VIZIO seeks a declaratory judgment of noninfringement that the claims of the Patents-in-Suit cannot be validly construed to cover any product or service made, sold, used, offered for sale, or imported by VIZIO in the United States.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

121.    VIZIO re-alleges and incorporates by reference the allegations set forth in Paragraphs 66-120.

122.    MIT entered into express or implied contractual commitments with the ATSC, ISO, ITU, and their respective members and affiliates relating to ATSC and/or MPEG-2 technologies and standards.

123.    Each third party that would potentially implement ATSC and/or MPEG-2 technologies, including VIZIO, was an intended beneficiary of those contracts.

124.    MIT was contractually obligated to offer a license to any essential patents consistent with the applicable licensing commitments and the patent policies of the ATSC, ISO, and ITU, including licensing on fair, reasonable, and nondiscriminatory terms.

125.    MIT breached these contracts by refusing to offer to VIZIO a license to its "essential patents" (including the Patents-in-Suit) under fair, reasonable, and nondiscriminatory terms.

126.    As a result of these contractual breaches, VIZIO has been injured in its business or property, including damages associated with the cost of defending this improperly filed

lawsuit, and is otherwise threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

## FOURTH CAUSE OF ACTION
### (Waiver)

127.    VIZIO re-alleges and incorporates by reference the allegations set forth in Paragraphs 66-132.

128.    MIT expressly stated in its patent declarations to the ATSC, ISO, and ITU that it would license any essential patents under fair, reasonable, and nondiscriminatory terms.

129.    Through these express statements, MIT voluntarily and intentionally waived its rights to obtain compensation for any essential patents for the ATSC and/or MPEG-2 standards other than under fair, reasonable, and nondiscriminatory terms.

130.    VIZIO will suffer irreparable injury by reason of the acts and conduct of MIT alleged above until and unless the Court enjoins such acts, practices, and conduct.

## PRAYER FOR RELIEF

WHEREFORE, VIZIO prays for relief as follows:

A.      That this Court declare and decree that VIZIO has not directly infringed, has not willfully infringed, contributed to the infringement of, induced infringement of, and does not infringe any of the claims of the '575, '435, '491, and '210 patents;

B.      That this Court declare and decree that the '575, '435, '491, and '210 patents are invalid and/or unenforceable;

C.      Enter judgment that this is an exceptional case under the provisions of 35 U.S.C. §285 in favor of VIZIO, and award VIZIO its costs and reasonable attorneys' fees incurred as a result of this action;

D.      That this Court declare and decree the proper fair, reasonable, and

        nondiscriminatory royalty rate for the Patents-in-Suit that MIT is obligated to

        offer to VIZIO;

E.      That this Court declare and decree that MIT is liable for breach of contract;

F.      That this Court declare and decree that MIT waived its rights to obtain

        compensation for the '575, '435, '491, and '210 patents other than under fair,

        reasonable, and nondiscriminatory terms;

G.      That this Court declare and decree that MIT has not offered to VIZIO a license to

        the '575, '435, '491, and '210 patents under fair, reasonable, and

        nondiscriminatory terms;

H.      Enter judgment against MIT for the amount of damages VIZIO proves at trial;

I.      Enter judgment awarding VIZIO its expenses, costs, and attorneys' fees in

        accordance with Rule 54(d) of the Federal Rules of Civil Procedure;

J.      Preliminarily and permanently enjoin MIT from further demanding excessive

        royalties from VIZIO that are not consistent with MIT's obligations, and from

        enforcing or seeking to enforce patent infringement claims against VIZIO; and

K.      For such other and further relief as the Court deems just and proper.

## **Jury Demand**

VIZIO, Inc. demands a trial by jury on all issues so triable.

                                Respectfully submitted,

                                VIZIO, Inc.

Dated:  September 30, 2013

                                /s/ Brendan T. St. Amant

                                T. Christopher Donnelly (BBO # 129930)
                                Brendan T. St. Amant (BBO # 672619)

DONNELLY, CONROY & GELHAAR, LLP One
Beacon Street 33rd Floor Boston, MA 02108
Telephone: (617) 720-2880

Todd E. Landis *(pro hac vice)*
State Bar No. 24030226
tlandis@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: 214.969.2800
Facsimile:  214.969.4343

Kevin G. McBride *(pro hac vice)*
kmcbride@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
633 West Fifth Street, Suite 4900
Los Angeles, CA 90071
Telephone: 213.254.1200
Facsimile:   213.254.1201

James L. Duncan III *(pro hac vice)*
State Bar No. 24059700
jduncan@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor
Houston, Texas 77002
Telephone: 713.220.5800
Facsimile: 713.236.0822

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 30, 2013, he caused to be served, a true and correct copy of the foregoing VIZIO's Answer to MIT's Complaint and Counterclaims to all counsel of record via ECF filing.


<u>/s/ Brendan T. St. Amant</u>